Case number 153326 Tracy Thompson v. The Ohio State University et al. Oral argument not to exceed 15 minutes per side. Mr. Camillus for the appellant. Good morning, your honors. May it please the court, my name is John Camillus appearing on behalf of the plaintiff appellant Tracy Thompson. I'd like to reserve three minutes for rebuttal. Fine. Your honors, time permitting, I intend to address all three of the claims on appeal. The race discrimination claim against Dr. Schweikert, the Title VI claim against the university, and the First Amendment retaliation claim against Dr. Salenbeam. But I'd like to begin with where we've begun in our brief, which is with the race discrimination claim against Dr. Schweikert. Not all prima facie cases are created equal. Often, the force of a prima facie case depends on the non-discriminatory rationale that's offered by the defendant. The Supreme Court has stated that in many cases, statistics constitute the only avenue of proof to uncover unlawful discrimination. The District Court's principal error was failing to recognize the relationship between a plaintiff's prima facie case and a defendant's proffered non-discriminatory rationale. Here, the District Court assumed without deciding, though we believe the assumption was correct, that plaintiff's statistical evidence met her prima facie burden. The District Court went on to grant summary judgment in favor of Dr. Schweikert, finding that unless plaintiff could present other evidence suggesting that the proffered reasons are not true, Dr. Schweikert is entitled to summary judgment. But this was wrong. When the evidence used to establish a plaintiff's prima facie case also rebuts the non-discriminatory rationale offered by the defense, no additional evidence is necessary. Take it run of the mind— So depending upon the statistical evidence, is that your strongest part of your case? In terms of the equal protection claim, it is. Absolutely, Your Honor. Yes. Are you relying on a McDonnell-Douglas theory for the discrimination claim? It depends what we mean by the McDonnell-Douglas theory. Well, the four-part prima facie— We are not. We believe— What is the prima facie case test, then, that you need to meet? Okay, so there's numerous cases cited in the briefs that show that in order to meet the first stage, which is normally met through the four prongs, you can use direct evidence, circumstantial evidence, which is the four prongs, or statistical evidence. But statistical evidence of what? You have to have some kind of criteria in your prima facie case. Yes. And what I'm confused about is what are the criteria that you need? So the criteria for whether statistical evidence makes a prima facie case is whether the statistics demonstrate a racial, in this case, disparity in treatment by the defendant relative to African-American students here or non-African-American students. And what case would say that that's all that you need to make a prima facie case? Your Honor, I did not find any case that specifically says when you use the statistical method, here is the criteria you need to meet. We do have cases that say generally that in order for the statistics to carry the necessary weight, there needs to be at least two standard deviations from the expected outcome. But are you saying, I'm sorry that I'm having trouble with this, but I think it's critical to your case, are you saying you don't need to show an adverse action, you don't need to show causation, the way you do normally under the McDonnell-Douglas? That's correct. That's correct. All you need to show is the way you phrased it, that the statistics demonstrate a racial disparity in the treatment of the students. That's correct. That's correct. The four prongs are gone. The case law says that there are three ways to meet your prima facie case. Direct, circumstantial, or statistical. The four prongs are the circumstantial method. We use the statistical method. What case is that that says that those are the three? Your Honor, there are a number that we cite in our brief. Let me try to flip to it. What's your best case? Just go with the top one. Sure. Let me try to flip to it if I might. I don't know that off the top of my head. There are frankly quite a few that we cited. Let me get to that portion of the brief if you give me just a moment. Aynsley Gaines v. Runyon, which is from the Sixth Circuit, 100 F. 3rd, 1220, says to establish a prima facie case of discrimination. This is in the Title VII context. The plaintiff may prove or claim through direct evidence, statistical proof, or the test established by the Supreme Court in McDonnell-Douglas. The Court ruled similarly in Owen v. Penton Publishing and Milonarek v. Parker-Hannafin, Hilbert v. Ohio Department of Rehab and Correction. Those are all on page 27 of our principal brief. So this Court repeatedly said there are three ways to make your prima facie case. There's statistical, direct, and circumstantial. Were those 1983 or 1981 cases? Or is it all Title VII? They're all in the Title VII context, yes. In a run-of-the-mill take a gender discrimination case, where the plaintiff meets her prima facie case by showing that she's female, there's no dispute, she's qualified for her job, there's no dispute. An adverse action was taken because she was fired, there's no dispute. And to meet the fourth prong of her prima facie case, she shows that she was replaced by a male. She's now clearly met her four prongs under traditional McDonnell-Douglas analysis. The burden shifts to the defense to offer a non-discriminatory rationale. Suppose the defense says, we fired this woman not because she's a woman, but because she failed to meet her sales quota last year. In a case like that, the plaintiff would clearly have to proffer additional evidence, because nothing about the evidence in support of the prima facie case serves to rebut that non-discriminatory rationale. But if you tweak the example a little bit, and the plaintiff meets her fourth prong of the prima facie case by showing that she was treated differently than similarly situated male employees, by showing, yes, I failed to meet my sales quotas last year, but so did these three male colleagues of mine. If the defendant's non-discriminatory rationale is, we didn't fire her because she's female, we fired her because she failed to meet her sales quota, the plaintiff can use the same evidence that she used to make her prima facie case to rebut that non-discriminatory rationale. Can I focus just a minute not on the case law relating to this, but the specific statistical evidence that you presented? Certainly, Your Honor. As I understand it, and I looked back, I don't have the statistical report in front of me, but as I understand it, what you showed was that the three referrals made by Dr. Schweikert were all of African, over the course of her long employment tenure. That's correct. Were of African American students. Yes. What else did it show? Well, the corollary, of course, being that there were no white students. What else did it show? I mean, is there a discussion of why this could be statistically significant, given the fact that it relates to one person, a very situational thing, over a period of time? I mean, what help does the expert report give us with respect to the inferences, if any, to be drawn from that? Certainly, Your Honor. So what the statistics show, what the expert report says is the likelihood of a professor who has taught this many, hundreds and hundreds and hundreds of white students, never accusing any of academic misconduct, and has taught only these few dozen African American students, and has accused three of misconduct. Does the report show how many students the professor taught over that period of time? Yes. Does it show how many African American students she taught? Well, we necessarily use estimates for those, but the answer is yes. You don't know for sure. We don't know for sure, because we don't have that information. Ohio State couldn't provide it. So where did you get the information about how, I mean, where did you get your estimates? Sure. So Ohio State answered, and Dr. Schweiker testified, that there are generally 30 students per year in this program. So you multiply 30 by the length of time Dr. Schweiker has been there, you have the total number of students. Did she teach any other courses? Has she taught any other courses? Well, this is not for that course. It's for her program, as I understand it, and that's the program in which she teaches. Well, I mean, has she done anything else during her employment tenure that might qualify as teaching students? Not that I'm aware of. But did you ask that question? We didn't ask that question, no. All right. I would suggest, Your Honor, that in Barnes v. Gencorp, I don't mean to cut you off. If you had a question, go ahead. I wanted to explain. Well, no, I'm just exploring the factual underpinning of this, and it seems to me at least that there's some question about the shakiness of the underpinnings for this opinion that leaps forth from the expert's head with certainty. I mean, if he's using flawed data, then we have no idea whether this is a flawed conclusion or what the inference is to be drawn from it. I think that's fair, Your Honor, but I would say, and Barnes v. Gencorp says this, that the plaintiff doesn't have to anticipate every possible objection to their statistical proof when they make it. When you've got an expert that looks at the statistics, and there is a basis for these. But, I mean, it's your burden on this. Well, at some level, it becomes a defendant's burden to say, hold on, you're using the wrong numbers. They have no expert, even at all. They never say we have the wrong numbers. They never say that our expert's methodology is flawed. They don't have no expert to say it. They say it off the cuff. Well, certainly they contend that the inference you say should be drawn from the statistics should not, in fact, be drawn from the statistics. They absolutely contend that, but they're wrong about that. The statistics, unless you can show that the numbers that underlie the statistics are off, or there is a legitimate selection criteria that would skew the statistics, then there's no room for debate about what the statistics mean. Is there a case that has used statistics with respect to one individual professor or one individual employer person? So I could see statistics saying that General Motors in some division has certain statistics that show it does or doesn't discriminate, but is there a problem with this being just one individual professor? Sure. So Barnes v. GenCorp looks at that a little bit. Barnes v. GenCorp was a multi-plaintiff case, but the court addressed each plaintiff individually and said that for certain of the individual plaintiffs, their case ought to go to trial, summary judgment should not have been granted, and for others, summary judgment was appropriate. It didn't rule on any kind of class-wide basis. But also importantly, I think that the principle that comes from the cases that use the statistics is equally applicable. In Teamsters, which is a class case, which is a group-wide case, the court said that over time you would expect that an employer's hiring decisions would reflect the racial composition of the applicant pool. There's no principle reason that I can discern why that same truth wouldn't apply to over time you would expect Dr. Schweikert's accusations of academic misconduct to mirror the racial composition of her student body. And here it clearly hasn't. I see your red light is on. Thank you. I'll reserve the remainder of my time. Thank you. Good morning. May it please the court. Let me pick up where that line of questioning left off there. This is not a Teamsters case. This is not a pattern or practice case. We're dealing with three reports over the course of Dr. Schweikert's now 25 years at Ohio State University. We've cited cases in our brief, including the Cooper case from the U.S. Supreme Court, which is a post-Teamsters case that says even two does not constitute a pattern or practice. We've cited some other circuit court cases that pick up on that theory as well, saying two or three is not enough to show a pattern or practice. This is an individual disparate treatment case. And it's a 1983 equal protection case on top of that, which to prove an equal protection claim, you have to show that Dr. Schweikert treated similarly situated individuals differently than Teresa Thompson. You're saying then, are you, that your opponent's argument that this should be a statistical case and his three groups direct circumstantial statistical, you're saying you have to be under the McDonnell-Douglas similarly situated as prong four of the prima facie case situation? That's one of our arguments, Your Honor, yes, that it should primarily proceed under McDonnell-Douglas. Well, it could. It could be that the plaintiff could choose to do McDonnell-Douglas. But why can't the plaintiff choose, as this plaintiff said just moments ago, he had chosen to call this a statistical case as opposed to, he's not trying, at least in oral argument, to make it as a McDonnell-Douglas case. The cases that he cites are Title VII cases and are a little bit different than an equal protection disparate treatment case. For one, especially since this is an education case and not an employment type case, where in those Title VII cases you might have been dealing with a workforce reduction or a failure to hire where it's pretty clear that there is an adverse action there. In this case, the education context, it's not clear that just referring somebody to COAM, the Committee on Academic Misconduct at OSU, is in and of itself an adverse action. But his whole theory that he was expressing moments ago was that he was not going to go down that path, that he was going to say there's statistical evidence that shows that this professor referred only African-American students for discipline. So if, I'm going to assume that he can proceed under that type of a prima facie case and just use statistics, that throws us into Barnes v. Gencor, which if we look at Barnes, the analysis there was you have to show that there was a significant disparity, which although we take issue with his expert's report, the expert does say there was a significant disparity here. But Barnes v. Gencor also said that he also has to eliminate the most common non-discriminatory reasons for why these referrals were made. And he hasn't done that here. He hasn't contested that there was some error in Dr. Schweikert referring any of the three students to the Committee on Academic Misconduct. So you're saying you have to show an error in the reference to this board? I think that's one thing that he has to show. Where do you get that requirement? If we use that, this is in the Barnes case in Barnes cites to Seeger v. Smith, which is a D.C. Circuit case from 1984, which says, to use statistics, that statistics must show a significant disparity and eliminate the most common non-discriminatory explanations for the disparity. Thompson has failed to do that here. Dr. Schweikert, again, presented evidence as to why she referred not only Ms. Thompson but also these other two students to the Committee on Academic Misconduct. And again, Ms. Thompson doesn't counter that with any evidence whatsoever. Two of the three were found, in fact, to have committed the alleged violations. Is that right? That's correct, Your Honor. That's correct. So even if we proceed along the Barnes v. Gencor line, we've presented non-discriminatory reasons. The burden shifts back to Ms. Thompson to show that those reasons were inherently suspect. She hasn't done that here. Or present some other direct or circumstantial evidence. And she hasn't done that either. She just says, look back at my statistics again. But again, Barnes v. Gencor doesn't say you can go back to those statistics in a type of case like this. Can I ask you one thing about Teamsters and that analytical framework? This is just stripped to its simplest form. Teamsters is a theory that alleges typically an employer-wide pattern or practice of discrimination. And it's frequently proved through statistical evidence. That's right. Do you know of any case that says pattern or practice is available to challenge the hiring practices of a single representative of an employer or in this context representative of an educational institution? I'm not, Your Honor. And we cited the Reynolds v. Barrett case, which kind of leaves us on the precipice there and doesn't go that next step. And I've shepherdized that case. I did it again this week and couldn't find a case that takes the analysis to that next step. So there is some unchartered territory there. But let me go back to a point that you were raising about the statistics. And I think this goes back to the lack of discovery that was conducted in this case. When we deposed Ms. Thompson, she admitted no less than five times that she wasn't aware of any similarly situated individual that was treated differently by Dr. Schweikert. She also admitted that she didn't ask to see any of her classmates' Information Systems class papers to see if they had, in fact, used the same citation style she did. So that's there. When it came to Ms. Thompson conducting discovery, she didn't depose a single classmate of hers from that Information Systems class. She didn't try to track down any of the papers that they wrote. She could have done that. She alleged that they were doing it, but you're saying she didn't have any specific evidence. That's right, Your Honor. Didn't have any specific information on that. Didn't ask for class rosters for this class. Didn't ask for anything that might show the racial makeup. She claims that the university didn't have statistics going back that far, but she never asked if we had that information. She may say that FERPA wouldn't permit us to turn that over, but that's not true. There's an exception in FERPA. If she could have got a court order, the court order would have allowed the university to turn over that information if it had it. So the lack of discovery here, the thin record on this point, just goes to show that this use of a statistic is just some metaphysical doubt that doesn't counter everything else that happened here. Did Professor Schweikert in some way try to assist Ms. Thompson in getting into the program and writing letters for her or something like that? Yes, Your Honor. She was a champion of Ms. Thompson from the very get-go. Ms. Thompson applied to the program initially and wasn't admitted. She contacted Dr. Schweikert to ask, how can I get into the program? Dr. Schweikert suggested you might want to take some quantitative-type courses, statistics, because we didn't see that in your background. You were a dance major as an undergraduate. So Ms. Thompson went and took those classes, reapplied, didn't get admitted because or wasn't going to get admitted because her GPA was too low. Dr. Schweikert went to the graduate school and said, can you make an exception here for Ms. Thompson? Graduate school did. She gets admitted. She then takes classes with Dr. Schweikert. Dr. Schweikert writes letters of recommendation for her to get fellowships. The plaintiff has a different viewpoint as to what was going on there, and this is on summary judgment, so we look at the plaintiff's allegations and take them in the light most favorable to the plaintiff. So the plaintiff, for instance, said that she got the lowest grade in a course and that she believed she was being viewed negatively by the professor and that the recommendation had to be done by the chairman or the lead professor in that area. So there are explanations that are less favorable than the ones that you're pointing out. But she doesn't take that next step of pointing to some similarly situated individual that was treated differently. The similarly situated may or may not matter. I mean, it seems to me that the salient point would be whether there is any evidence, putting aside the statistics for a moment, whether there's any evidence other than Ms. Thompson's personal opinion, which as we know, based on the case law, cannot support a Title VII claim. This is not a Title VII claim, but if you're importing Title VII analysis. So this is possibly a more appropriate question for your adversary, but since it came up, I'll ask you. I mean, there are two other students who say they believe she was treated negatively, although neither was willing to say that race had anything to do with it. Are there other things beyond that? I mean, for example, do we know that she did have the lowest grade in the class? We don't know that. That's not in the record. Again, there was no request for class rosters or the grades of other students in the class. So to your point again, there's really not much in the record other than this statistic to go to her equal protection claim. Could it be an adverse action to refer a student for disciplinary investigation? In what context, Your Honor? In the equal protection context? Right. I'm not aware of any education-related cases that look into whether that's an adverse action. So we went to the Title VII case law and looked at the cases there, and the analogy might be referring somebody for an investigation. And there are cases in the Title VII context that say that's not enough to make out an adverse action. And we've cited those cases in our report. The adverse action would be the suspension. That's correct, what the Committee on Academic Misconduct eventually lodged. And Dr. Schweikert urged them not to suspend her, didn't they? That's right. She did twice. She did on the initial referral to COAM. She said don't suspend her. It'll prevent her from graduating on time. And then at the actual hearing, she came to bat for Ms. Thompson again, saying don't suspend her. This will put her behind, and she won't be able to graduate on time. That doesn't sound like somebody who's a racist to me. That sounds like somebody who advocates for their students regardless of race. I want to move to the First Amendment retaliation claim for a second because I think there was something that was maybe passed over a little bit in the briefs. And that was on the referral that Dr. Salem being made of Ms. Thompson to the Office of Student Conduct. And there was some question whether or not that constitutes retaliation. And I think it's missed a little bit in the record that at the time Dr. Salem being reported Ms. Thompson violating her suspension to the Office of Student Conduct, she didn't have knowledge of this Office of Human Resources complaint at the time she made that referral. So this is a Thaddeus X case where the court has said if there's no knowledge of the protected activity, there can't be any retaliation. Didn't Ms. Thompson testify that she mentioned that to Dr. Ms. Salenby prior to the time the referral was made? My recollection is that Ms. Thompson submitted an affidavit in response to our motion for summary judgment. Well, and there's a little dispute there about whether that was inconsistent with her deposition. That's correct. That's correct. And I think if you look at the record here, it doesn't support that Ms. Thompson could have made that suggestion before or during the COAM hearing, which is what she alleges here. The audio recording of the COAM hearing is in the record. There's no mention there. Prior to the COAM hearing, Ms. Thompson met with Tim Curry, who is the director of COAM. Mr. Curry, Dr. Curry, said you cannot bring up race discrimination during the COAM hearing. That's not the focus of the hearing. You can't bring it up. So couple that with Ms. Thompson's testimony that she went to the Office of Human Resources but said don't tell anybody about my complaint, especially don't tell Dr. Schweikert. So if we look at those things together, it just doesn't seem consistent that she would have made this mention of race discrimination at the COAM hearing. That's the direct contradiction. I thought she was suggesting she made it earlier. Earlier. But I think the point is the same, that she had this direction from Dr. Curry not to bring it up. She goes to OHR and says don't tell anybody about my OHR complaint. So why she would have brought it up before the hearing or even during the hearing just seems inconsistent. But does the plaintiff state in a sworn statement that she did tell this ahead of time, and why do we not need to give that credit? Is it simply the timing that it's in an affidavit and the affidavit postdates the deposition? Is that what it is? It is. It's that and our argument that it directly contradicts her testimony from her deposition. And how does it directly contradict the deposition? During the deposition she was asked. I see that my time is up. You can answer. Thank you. She was asked when did you bring up race discrimination? She goes I don't remember. I don't recall. When did you form the belief that Dr. Schweikert discriminated against you based on race? She says I don't remember. I don't recall. And then she was asked the question about her interactions with Dr. Curry. She says Dr. Curry told me I can't bring it up. It's not something I can bring up during the hearing. And then she was asked these questions about the OHR complaint. And when did you raise the complaint with OHR? And the interactions with OHR, the Office of Human Resources, after that where she says, where she told them don't mention this to anybody. Put it on hold. Don't tell anybody. I think that whole line of questioning contradicts the fact that she would have brought this up beforehand. I think this was a self-serving statement after the fact, knowing that she had improved knowledge. To call something a self-serving statement, virtually every person who is participating in a lawsuit is making self-serving statements. So I'm sure your clients were making a lot of self-serving statements too. Valid points. At the end, I'll just ask you to refer back to our brief and affirm the district court's grant of summary judgment. Thank you. Thank you. I'd like to hit briefly a topic on First Amendment and then get back to equal protection if I could. Ms. Thompson also submitted an answer to interrogatories. In which she said, I don't have the number in front of me, but those are in the record. Her answer to interrogatories prior to her deposition stated that prior to the COAM hearing, in Dr. Salenby's presence, she complained of race discrimination. So it's not simply an after the fact, something that came up as defendants allege. What about the question that I was asking your adversary about what is in the record? Put aside the statistics for a moment. What is in the record other than your client's personal opinion that suggests she was a victim of race discrimination? As you mentioned in that question, the HR report indicated that there were other students who said that Dr. Schweiker treated Tracy differently. They weren't willing to go the next step and accuse Dr. Schweiker of race discrimination. But they did say, for instance, she came down harder on Dr. Schweiker. You also mentioned in your question with my colleague about the lowest grade in the class. He said that was not in the record. That's false. It is in the record. We asked for that in discovery in interrogatories. We got the answer. It's response to interrogatory number 21. It's RE91-2, page ID 2020. In the only class that Tracy Thompson took with Dr. Schweiker before the class in which she was accused of misconduct, she received a B. There were 17 students who got an A, 11 who got an A-, four who got a B+, five who got a B-, and Tracy was one of the ones who got a B. That's in the record. We did ask. It was the prior class. Yes, in the first class that she had, which, by the way, is part of the basis for OSU's ultimate determination that she wasn't discriminated against, was that prior class and the fact that they said that she received positive grades. I mean, it's a little hard to know what to make of this record because you have a plaintiff who's accusing a professor of race discrimination, a professor who went out of her way to help her, and you have the professor coming down hard on her about some things which might suggest perhaps what you suggest but also might suggest a disappointment in the student whom she had tried so hard to help. Your Honor, I think that's fair. I think that's up to a jury. What you just described is competing evidence. There is evidence. I'm not sure there's enough or not when you put aside your statistical proof. Fair enough. If, in fact, our statistical proof is set aside, I think that's a legitimate question. This is incredibly powerful statistical proof. We asked for the numbers. We asked how many white students, how many black students has Dr. Schweiker taught. OSU said we don't have any records that keep track of that. However, we can tell you that based on grants we've applied for that historically we have about 20% minority population in this program. We simply extrapolated from that how many African-American students she taught. And because we don't have the precise numbers, our expert, who's completely unrebutted by the other side, they don't have any statistician, any mathematical PhD to come forward and say that there's something wrong with our statistical analysis. They can't. It's pretty basic. But we run the gamut. We say if she taught this many students, this many students, this many students, this many students, and we say if this percentage were black, if this percentage were black, if this percentage were black, there's only a modest range in which those things could fit. If 20% of the students are minority, you're not going to have more than 15% who are African-American, and those numbers are really at the margins. Even if you use the numbers that are most favorable to Ohio State, you use all of the assumptions contrary to what the summary judgment record requires about how many students Dr. Schweikert taught and how many of them were African-American, it still is extraordinarily unlikely, well beyond multiple standards of deviation, that Dr. Schweikert would accuse only African-American students and not white students of academic misconduct. Do you concede that without the statistical information that you lose your case? Absolutely. So that would mean that over the history, assuming it's 20 years, not 25, and assuming it's only 15%, not 20%, she still taught 90 African-American students. Yes. So she might have referred three of them, but there are 87 she didn't refer. That's correct. Your expert doesn't refer to that, does he? I mean, that is incorporated. He doesn't address it in some kind of narrative, but that's incorporated into the statistics. That's precisely what the statistics reflect. That means, under the numbers that you just gave, that Dr. Schweikert has referred 3.33% of her African-American students for academic misconduct out of 90, which is a fairly significant sample size, and 0 out of 600. The chances of that are almost infinitesimal. Your red light is on. Thank you, Your Honor. Thank you very much. Appreciate your time. Thank you both for your argument. The case will be submitted. Would the clerk call the next case, please?